**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AMERISURE INSURANCE COMPANY and AMERISURE MUTUAL INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 23-cv-04098 |
| vs. | ) | |
| | ) | |
| PREMIER DESIGN + BUILD GROUP, LLC; PREMIER DESIGN + BUILD NATIONAL, LLC; and DUKE REALTY ePORT URBAN RENEWAL, LLC | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| PREMIER DESIGN + BUILD GROUP, LLC and PREMIER DESIGN + BUILD NATIONAL, LLC, | ) ) ) | |
| | ) | |
| Defendants/Counter-Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AMERISURE INSURANCE COMPANY and AMERISURE MUTUAL INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| Plaintiffs/Counter-Defendants. | ) | |

**<u>JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS FOR CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>**

Plaintiffs/Counter-Defendants, Amerisure Insurance Company and Amerisure Mutual Insurance Company (collectively "Amerisure") and Defendants Continental Insurance Company ("Continental"), Continental Casualty Company ("Continental Casualty") and American Casualty Co. of Reading, PA ("American Casualty") (collectively "CNA"), pursuant to Fed. Rule Civ. Pro. 56, Local Rule 56.1 and the Court's Standing Order titled "Summary Judgment Practice," hereby present

their Joint Statement of Undisputed Material Facts for their Cross-Motions for Summary Judgment.

### A.     **The Project**

1.      On or about August 18, 2015, Bridge Perth Amboy, LLC entered into a contract with Premier Design + Build National, LLC ("Premier National") (the "Contract") to build three warehouse buildings and at least two access bridges (the "Project") on the Property.  A true and correct copy of the Contract is located at **Exhibit "A"**.  The contract includes the following, in part:

**ARTICLE 2- CONTRACTOR'S PERFORMANCE**

2.1     Contractor's Performance of the Work - General. Contractor agrees, for the consideration and under the terms and conditions hereinafter set forth, to provide and furnish all design services, materials, supplies, apparatus, appliances, equipment, fixtures, tools, implements, labor, supervision, accounting, transportation, utilities, storage and services required to design and construct the Project at the Project site in accordance with the Contract Documents. The Work shall be performed and completed by Contractor in a good and workmanlike manner, free of any and all liens and claims of laborers, artisans, material men, suppliers, and subcontractors.

2.2     Contractor's Performance of the Work - Demolition. Contractor shall furnish all of the material and perform all of the work necessary for the complete demolition of buildings as required in the Contract Documents at the Project site in accordance with all applicable federal, state and local laws, statutes, ordinances, rules and regulations.

2.3     Contractor's Performance of the Work - Design Services. Contractor shall furnish professional design and engineering services necessary for the design and construction of the Project, including without limitation infrastructure improvements, in accordance with the plans and outline specifications and correspondence or documents amending the same, attached as Exhibit B and made a part hereof, and in accordance with the applicable building regulations and the scope of Work as defined herein. As required, Contractor shall contract for the services of licensed professionals as listed in Exhibit I and agrees to forthwith prepare the Drawings and Specifications in accordance with Exhibit A and applicable building regulations and submit the same for Owner's written approval. As required, Owner shall pay Contractor directly for all design costs associated with the Contractor's agreement or agreements with the licensed professionals.

*       *       *

*See* Exhibit "A" at pp. 3-4.

2.       For purposes of this motion only, it is undisputed that Duke Realty ePort Urban Renewal, LLC ("Duke Realty") is the successor in interest to Bridge Perth Amboy Urban Renewal, LLC, formerly known as Bridge Perth Amboy, LLC, which owned the property where the Project is located until on or about November 22, 2017.  *See* **Group Exhibit "C"** at ¶ 10, p. 4.

3.       For purposes of this motion only, it is undisputed that on November 22, 2017, Bridge Perth Amboy Urban Renewal, LLP assigned the Contract to Duke Realty via an Assignment and Assumption of Service Agreements and Intangibles, a true and correct copy of which is located at **Exhibit "B",** at p. 2.

4.       For purposes of this motion only, it is undisputed that on or about August 18, 2015, Premier National assigned certain rights and obligations under the Contract to its affiliate, Premier Design + Build Group, LLC ("Premier Group") (collectively Premier National and Premier Group are referred to as "Premier Design"), pursuant to a Partial Assignment of Construction Agreement ("Premier Assignment"). For purposes of this motion only, it is undisputed that, pursuant to the Premier Assignment, Premier Group entered into various subcontract agreements for design and construction of the Project.  *See* Complaint in the Underlying Illinois Action at ¶13, a true and correct copy of which is located at **Group Exhibit "C",** at p. 4.

5.       Pursuant to the terms of the Contract, Premier National, then Premier Group, agreed to provide demolition, design, engineering, architectural, and construction services for the Project. *See* Ex. "A" at §§ 2.1-2.4, pp. 3-5.

B.       **Amerisure's Reservation of Rights Letter**

6.       On December 4, 2019, Amerisure Mutual Insurance Company ("Amerisure Mutual") issued a reservation of rights letter to Premier National in response to its claim regarding

the Project which informed Premier National that Amerisure Mutual was investigating the claim as to the 980 High Street Building asserted by Duke Realty and requested additional information in regard to the claim, subject to a reservation of rights to deny any coverage. A lawsuit had not been filed by Duke Realty against Premier Group or Premier National at that time. A true and correct copy of the December 4, 2019 reservation of rights letter is located at **Exhibit "D"**.

### C. Duke's October 6, 2022 Notice to Premier Group

7. Via correspondence from Duke Realty to Premier Group dated October 6, 2022, Duke Realty notified Premier Group of alleged defective construction with the 980 High Street Building and that Duke Realty had begun remedial work on the building. A true and correct copy of the October 6, 2022 notice is located at **Exhibit "E"**.

### D. Amerisure's Supplemental Reservation of Rights Letter to Premier National

8. In correspondence dated April 21, 2023 from Amerisure Mutual to Premier National, Amerisure acknowledged receipt of Duke Realty's October 6, 2022 notice to Premier Group, and reserved all rights to deny coverage to Premier National in relation to Duke Realty's claim. A true and correct copy of the April 21, 2023 reservation of rights letter is located at **Exhibit "F"**.

### E. Amerisure's Second Supplemental Reservation of Rights Letter to Premier Design

9. In correspondence dated January 9, 2024 from Amerisure to Premier Design, Amerisure informed Premier Design that it would defend Premier Design in the lawsuit against Premier Design titled *Duke Realty ePort Urban Renewal LLC v. Premier Design + Build National LLC, et al.*, Case No. 2023L004533 in the Circuit Court of Cook County, Illinois ("Underlying Illinois Action"), subject to a reservation of rights. A true and correct copy of the January 9, 2024 reservation of rights letter is located at **Exhibit "G"**.

### F.      The Subcontract

10.      Premier Group entered into a subcontract with SESI Consulting Engineers ("SESI") for work at the Project.  On May 24, 2024, Amerisure served a subpoena on SESI in this action. A true and correct copy of the subpoena is attached at Group Exhibit "H", pages 2-24.  The subpoena requested, in part, the following:

1.  Full copies of any and all contracts and/or subcontracts entered into between Premier Group and SESI that relate to the Project and/or the Duke Lawsuit with all Exhibits thereto, including but not limited to the February 23, 2016 Subcontract.

2.  Full copies of any and all contracts and/or subcontracts entered into between Premier National and SESI that relate to the Project and/or the Duke Lawsuit with all Exhibits

*See* Group Ex. "H", p. 6.

11.      In response to the subpoena, SESI produced the documents attached at pp. 25-188 of Group Exhibit "H". It is undisputed that there are multiple documents produced by SESI and contained in Group Exhibit "H" that are entitled "CONSULTING ENGINEER AGREEMENT Between PREMIER DESIGN + BUILD GROUP, LLC And SESI CONSULTING ENGINEERS For ePort Buildings A, B, & C 960-1000 High Street Perth Amboy, NJ 08861. *See, e.g.,* Group Ex. "H" at p. 25. It is undisputed that the documents included in the documents produced by SESI entitled "Consulting Engineer Agreement" include the following:

**I. IDENTIFICATION OF PARTIES**

This Agreement made and entered into this 23rd Day of February 2016 between PREMIER DESIGN + BUILD GROUP, LLC, 1000 Irving Park Road, Suite 200, Itasca, IL 60143, hereinafter called PDBG, and SESI CONSULTING ENGINEERS 12 MAPLE AVENUE, PINE BROOK, NEW JERSEY hereinafter called ENGINEER.

**II. IDENTIFICATION OF PROJECT**

The project for which storm water pollution prevention consulting is to be provided is known as the ePort Buildings A, B, C 960-1000 High Street Perth Amboy, NJ 08861.

**III. DESCRIPTION OF SERVICES**

The ENGINEER [SESI] will provide the following professional services for PDBG [Premier Group] in accordance with the terms and conditions of this Agreement. ENGINEER [SESI] will provide PDGB [Premier Group] with site inspection services during the construction to ensure that there are proper erosion and sediment controls maintained in effective operating condition at all times in accordance with the SWPPP [Storm Water Prevention Plan]. In accordance with the SWPP [Storm Water Prevention Plan], a site inspection will be conducted at minimum of once every seven (7) calendar days. The SWPPP [Storm Water Prevention Plan] inspection is to be performed on the same day as the weekly construction meeting to reduce overall inspection costs. A copy of the hand-written field notes will be provided to PDBG [Premier Group] on the day of the inspection and a written report will be issued within two (2) business days of the inspection, except in cases where issues or deficiencies which require immediate action are observed at a site inspection, in which case field notes and a written report shall be issued immediately. ENGINEER [SESI] will provide management, as required, during the construction phase of the project. This will include attendance at meetings, review of additional reports/documents/plans, and site visits by the project engineer. In addition, ENGINEER [SESI] will assist in the development of annual reports and certifications in accordance of the SWPPP [Storm Water Prevention Plan], as necessary.

Description of Services is based on the following assumptions: all work will be performed in accordance with the Stormwater Pollution Prevention Plan (SWPPP), developed by Menlo Engineering Associates, dated December 1, 2015.

All work shall be performed only when requested by PDBG [Premier Group] and shall be invoiced on a time and material basis not to exceed the amount listed below. Invoices shall be provided to PDBG [Premier Group] by the 25th of each month and will be paid within 45 days of invoice date. Signed field tickets shall accompany each invoice as documentation of work performed.

*See, e.g.,* Group Ex. "H" at p. 25.

12. It is undisputed that the documents included in the documents produced by SESI entitled "Consulting Engineer Agreement" also include the following:

**VI. STANDARD OF CARE**

The Standard of Care for all professional engineering and related services performed or furnished by ENGINEER [SESI] under this Agreement will be the care and skill ordinarily used by members of ENGINEER'S [SESI's] profession, practicing under similar conditions at the same time and in the same locality. No instance is to be responsible for means and methods of performance of the work, supervision, sequencing of construction, or safety in, on, or about the project site of others.

PDBG [Premier Group] recognizes that environmental geologic, geotechnical, planimetric, and topographic conditions can vary from those encountered at the times when, and

6

locations where data are obtained, and that the limitations inherent in extrapolating data may result in some level of uncertainty with respect to the interpretation of these vconditions, despite due professional care.

ENGINEER [SESI] shall be liable only for its own acts or omissions and assumes no liability for the acts or omissions of the PDBG [Premier Group] or other parties or for information provided by others and used in the execution of the work.

*See, e.g.,* Group Ex. "H" at p. 26.

13.     The copies of the Consulting Engineer Agreement include the following section on insurance:

**VIII. GENERAL CONDITIONS**

\*      \*      \*

G.      Insurance

1. Professional Liability

The ENGINEER [SESI] shall provide evidence to PDBG [Premier Group] that the ENGINEER [SESI] has obtained Professional Liability Insurance Coverage in the amount of at least One Million & No/100 Dollars ($1,000,000.00) in the form of an appropriate Certificate, with endorsements directly related to this project.

2. The ENGINEER [SESI] agrees to obtain, maintain and pay for such Worker's Compensation Insurance, as may be required by the law, Comprehensive Liability Insurance, Comprehensive Automobile Liability Insurance, protecting the ENGINEER [SESI] against claims of bodily injury or death or for damage to property occurring upon, in or about the project, or with limits in amounts at least equal to those specified below and as outlined in "Exhibit A":

    a. Limits of General Liability of not less than One Million and No/100 Dollars ($1,000,000.00), per person, and Two Million and No/100 Dollars ($2,000,000.00), per event, and One Million and No/100 Dollars ($1,000,000.00), for property damage. Comprehensive Automobile Liability of not less than One Million and No/100 Dollars ($1,000,000.00). Excess Umbrella Liability of not less than Five Million and No/100 Dollars ($5,000,000.00) overall.

3. The ENGINEER [SESI] shall furnish PDGB [Premier Group] a Certificate of Insurance evidencing Environmental Impairment Liability Coverage prior to commencement of the ENGINEER [SESI] work. All Certificates shall provide that no less than thirty (30) days

prior written notice shall be given in the even of material alteration to or cancellation of the coverages evidenced by such Certificates.

4. The ENGINEER [SESI] shall furnish PDBG a Certificate of Insurance evidencing the above coverages and limits prior to commencement of the ENGINEER [SESI] work. All Certificates shall provide that no less than thirty (30) days prior written notice shall be given in the even of material alteration to or cancellation of the coverages evidenced by such Certificates.

*See, e.g.,* Group Ex. "H" at pp. 26-27.

14. Also in SESI's subpoena response are three documents entitled Exhibit A. One of those documents is a single page "CERTIFICATE OF LIABILITY INSURANCE" with the word "SAMPLE" watermarked across it. The sample indicates that the certificate is for a CGL policy with limits corresponding to those in the Insurance provision of the Consulting Engineer Agreement. *See* Group Ex. "H" at p. 81.

15. Another Exhibit A in SESI's subpoena response is a single page document that states in part::

*****SAMPLE CERTIFICATE*****
RE: 1526 – Bridgepoint E-Port, Building A - 1000 High Street, Perth Amboy, NJ; Building B - 960 High Street, Perth Amboy, NJ; Building C - 980 High Street, Perth Amboy, NJ
It is agreed that the following are added as Additional Insured on the General Liability and Auto Liability policies with respects [sic] to operations performed by the Named Insured in connection with this project:
1.) Premier Design + Build Group, LLC
2.) Premier Design + Build National, LLC
3.) Bridge Perth Amboy, LLC
4.) Bridge Development Partners, LLC
The coverage afforded to the Additional Insureds is on a Primary and Non-Contributory basis.
A Waiver of Subrogation applies to the General Liability, Auto Liability, and Workers Compensation policies in favor of all additional insureds.
Excess/Umbrella Policy Follows Form
An additional Insured Endorsement Form must be submitted with certificate.
Required Form(s)*:
CG 20 10 01 - Ongoing Operations
AND
CG 20 37 10 01 Complete Operations
* Or Equivalent

*See* Group Ex. "H" at p. 83.

16.     SESI's subpoena response includes a "Certificate of Liability Insurance" that identifies SESI as the insured, Continental Insurance Company as the insurer, identifies the project at issue in this case, identifies Commercial General Liability policy number 6056872807 with a policy period of 12/23/2022 to 12/23/2023, and contains the following preface:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

*See* Group Exhibit "H" at pp. 42-43.

17.     The "Certificate of Liability Insurance" then states:

> IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer any rights to the certificate holder in lieu of such endorsement(s).

*See* Group Exhibit "H" at pp. 42-43.

18.     The Certificate includes another preface, stating:

> THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

*See* Group Exhibit "H" at pp. 42-43.

19.     The section of the "Certificate of Liability Insurance" entitled "DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may

be attached if more space is required)" contains the following statements:

> The General Liability and Automobile Liability policies include an automatic Additional Insured endorsement that provides Additional Insured status to Premier Design + Build Group, LLC, Premier Design + Build National, LLC, Bridge Perth Amboy, LLC, Bridge Development Partners, LLC, only when there is a written contract that requires such status, and only with regard to work performed on behalf of the named insured.  The General Liability and Automobile Liability policies contain a special endorsement with Primary and Noncontributory wording, when required by written contract.  The Automobile Liability policy includes a Waiver of Subrogation endorsement in favor of additional insureds as referenced above.

*See* Group Exhibit "H" at pp. 42-43.

20.     SESI's response to the subpoena includes Change Order No. 2 dated August 16,

2016 to the Standard Subcontract Agreement dated February 23, 2016, which states in part:

> Costs associated with SWPPP oversight, project management, annual reporting, environmental sampling, culvert design, light pole design, and reimbursable expense. Revised May invoice 9327-04.
>
> $7,441.79
>
> Costs associated with SWPPP oversight, project management, annual reporting, environmental sampling, light pole design, topsoil testing for South Brunswick, and reimbursable expense. Revised June invoice 9327-05.
>
> $19,046.92
>
> Costs associated with SWPPP oversight, project management, annual reporting, environmental sampling, light pole design, topsoil testing for South Brunswick, and reimbursable expense.  Revised July invoice 9327-06.
>
> $674.00

*See* Group Exhibit "H" at p. 55.

21.     SESI's response to the subpoena also includes documents entitled "ADDENDUM

NO. 1 TO PROFESSIONAL SERVICES AGREEMENT" (dated February 29, 2016) (Group Ex.

"H" at pp. 44-45) and "ADDENDUM NO. 2 TO PROFESSIONAL SERVICES AGREEMENT"

(dated March 9, 2016) (Group Ex. "H" at pp. 69-72). The addenda list the dates of the documents,

a "PSA [Professional Services Agreement] Date" of December 21, 2015, and "PSA [Professional

Services Agreement] Authorized" date of February 24, 2016. Group Ex. "H" at pp. 44, 69. Both

addenda then state they are in addition to the "originally authorized Agreement referenced above."

10

*Id.* While neither party has produced a document that is entitled a professional services agreement and dated December 21, 2015, SESI's subpoena response includes a "PROFESSIONAL SERVICES AGREEMENT For ENVIRONMENTAL ENGINEERING SERVICES" dated January 19, 2016, which is labelled "Attachment A" and provides SESI's "SCOPE OF SERVICES," including "SWPP [Stormwater Pollution Prevention Plan] Inspection Services" and "Project Management & Annual Reporting." Group Ex. "H" at pp. 114-115. The forementioned addenda provide for additional services to be performed by SESI at the Project, including certain vibration monitoring, environmental sampling and reporting, and laboratory analyses. Group Ex. "H" at pp. 44-45, 69-72.

22.      SESI's subpoena response includes invoices to Premier Group for "Professional Services Rendered" on the Project, including line items for such things as SWPP Oversight, Project Management and Annual Reporting, Environmental Sampling and Testing, Foundation Design for Culverts, Laboratory Analyses, Light Pole Design, and other Reimbursable Expenses. *See* Group Ex. "H" at pp. 152, 154, and 156.

### G.      Tenders to Premier Design's Subcontractor SESI and Its Insurer

23.      On February 1, 2024, Amerisure issued a tender letter to SESI and its counsel which demanded that SESI and its insurer acknowledge a primary defense obligation to Premier Design in the underlying Illinois Lawsuit, immediately undertake that defense, and reimburse Amerisure the amounts that it incurred in the defense of Premier Design. A true and correct copy of the February 1, 2024 tender letter is located at **Group Exhibit "I"**. Premier Design issued an additional tender to SESI and its insurer on May 21, 2025. A true and correct copy of the May 21, 2025 tender letter is located at **Group Exhibit "I"**. Neither SESI nor its insurer CNA defended Premier Design in response to this tender, either. Neither SESI nor its insurer CNA have defended

Premier Design, and neither has agreed to reimburse Amerisure for amounts it has incurred for the defense of Premier Design in the Underlying Illinois Action or the Underlying New Jersey Action.

### H.     The Underlying Actions

24.     The allegations of the underlying complaints at issue in this action that were filed by Duke Realty in Illinois and New Jersey are not fully recited herein but are summarized below and attached hereto as Group Exhibit "C". The complete allegations in the complaints in Group Exhibit "C" are fully incorporated herein for purposes of this Joint Statement.

### 1.     The Underlying Illinois Action

25.     On May 1, 2023, Duke Realty filed its Complaint in the Underlying Illinois Action titled *Duke Realty ePort Urban Renewal LLC v. Premier Design + Building National, LLC, et al.*, Case No.: 2023L004533 in the Circuit Court of Cook County, Illinois. *See* Group Exhibit "C", at p. 2. The Underlying Illinois Action against Premier Design alleges breach of contract, negligence, and professional negligence arising from Premier's breach of its contractual and other obligations related to the design, engineering, and construction of warehouse the 980 High Street Building and two access bridges for the property.  *See* Group Exhibit "C", at p. 2, ¶ 2.  The Complaint alleges that "[d]ue to Premier's breaches and negligence, at least one of the buildings and two access bridges have experienced excessive and deleterious settlement."  *See* Group Exhibit "C", at p. 2, ¶ 1.

26.     The Complaint in the Underlying Illinois Action alleges that Bridge entered into a contract with Premier National to provide the demolition, design, engineering, architectural, and construction services necessary to build three warehouse buildings and at least two access bridges at the property. *See* Group Exhibit "C", at pp. 4-5, ¶¶ 12; 15. The bridges include the Eastern access bridge and the Western access bridge (collectively the "Access Bridges"). *See* Group

Exhibit "C" at p. 6, ¶ 21.

27.    Duke Realty alleges that pursuant to the terms of the Contract Premier Design agreed to perform, among other things, site work, which included: (1) mass excavation and fine grading of the site, including grading necessary to complete floor slabs, pavement areas, and green spaces; and (2) ensuring structural fill areas were compacted as recommended by a geotechnical engineer. *See* Group Exhibit "C", at p. 5, ¶ 17.

28.    Duke Realty alleges that Premier Design was advised that there were deposits of loose, uncontrolled fill materials and compressible, organic clay stratum below the fill on the property. *See* Group Exhibit "C" at p. 5, ¶ 18. Duke Realty alleges Premier Design knew that the soil stratum underlying the Property had the potential to cause damaging differential settlements under new load conditions, such as buildings and access bridges, if left untreated. *See* Group Exhibit "C", at p. 5, ¶ 19.

29.    Duke Realty alleges that Premier Design's subcontractors advised Premier Design to treat the area beneath the proposed access bridges and buildings, including at 980 High Street, Perth Amboy, New Jersey, with surcharging (applying excessive vertical load or weight in excess of that associated with the long-term development conditions to accelerate consolidation) to prepare the soil to support the eventual development and construction of access bridges and warehouse buildings. *See* Group Exhibit "C" at p. 6, ¶ 20.

30.    The Access Bridges were built prior to the construction of the warehouses. See Group Exhibit "C" at p. 6, ¶ 23. Duke Realty alleges that Premier Design was involved in the design, engineering, and construction of the Access Bridges (including foundational support for the bridges). *See* Group Exhibit "C" at p. 6, ¶ 21. Duke Realty alleges that Premier Design purportedly reviewed the design plans for the Access Bridges and oversaw their construction to

13

ensure that they would perform as intended and to ensure that they were built in accordance with the plans and specifications. *See* Group Exhibit "C" at p. 6, ¶ 23.

31. Duke Realty alleges that the Property and the soil beneath it are comprised of numerous layers of different types of materials, including a layer of artificial fill (gravel, rock, and man-made materials) and, below that, soft, organic, silty clay. *See* Group Exhibit "C" at p. 6, ¶ 25. Duke Realty alleges Premier Design anticipated heavy truck and tractor-trailer traffic over Access Bridges upon completion and occupancy of the warehouse. *See* Group Exhibit "C" at p. 6, ¶ 26.

32. Duke Realty alleges that the Access Bridges and their foundational elements were poorly planned, poorly designed, poorly engineered, poorly constructed, and thus not sound or fit for their purposes. *See* Group Exhibit "C" at p. 6, ¶ 27.

33. Duke Realty further alleges that as a result of these defects each of the Access Bridges has suffered significant damage, including but not limited to: (i) settlement of each bridge; (ii) cracks in the frame of each bridge; and (iii) gaps, settlement, and separation in the concrete masonry unit blocks making up the retaining walls. *See* Group Exhibit "C" at pp. 6-7, ¶ 28.

34. Duke Realty alleges Premier Design and/or their subcontractors surcharged the portion of the Property where the original footprint of the building located at 980 High Street was to be built. *See* Group Exhibit "C" at p. 7, ¶ 30. Duke Realty alleges it was later decided that the 980 High Street building's footprint would be increased and that additional space would be built on the portions of the Property that had not been sufficiently surcharged by Premier Design and/or their subcontractors. *See* Group Exhibit "C" at p. 7, ¶ 31.

35. Duke Realty alleges that Premier Design worked with Menard Group and GEI Consultants, Inc. to develop a system of rigid inclusions or controlled modulus columns to reinforce the soil beneath the 980 High Street building extension to support the building and to

prevent deleterious settlement of the building. *See* Group Exhibit "C" at 7, ¶ 32.

36.     Duke Realty alleges that, on February 15, 2017, Bridge Perth Amboy, LLC entered into a lease agreement with Target Corporation ("Target") for Target to lease the 980 High Street Building.  *See* Group Exhibit "C" at p. 7, ¶ 33.

37.     Duke Realty alleges that in 2019, Target sent it a letter informing Duke Realty of cracking and potential failure of the exterior wall and foundation of the 980 High Street Building. *See* Group Exhibit "C" at p. 7, ¶ 34.

38.     As a result of the alleged settlement, the 980 High Street Building sustained extensive damage related to separation and movement between the floor slab and the exterior walls.  *See* Group Exhibit "C" at p. 8, ¶ 37.

39.     Duke Realty alleges that the damage to the 980 High Street Building includes, but is not limited to: separating joints; broken pipes; gaps in flooring; doors separating from walls; settling of wall footing; and visible distress on the inside of the building.  *See* Group Exhibit "C" at p. 8, ¶ 38.

40.     Duke Realty further alleges that the damage was caused by "excessive settlement in the area of the 980 High Street Building Extension, where Premier Design failed to sufficiently complete surcharging prior to construction and where Premier Design and their subcontractors' design, engineering, construction, and installation of CMC's failed to support the 980 High Street Building Extension and failed to prevent unusual and deleterious settlement." *See* Group Exhibit "C" at page 8, paragraph 39.

41.     Duke Realty also alleges that it has taken remedial measures to abate further settlement and damage to the 980 High Street Building and to alleviate disruption to its tenant's ongoing business. *See* Group Exhibit "C" at p. 8, ¶ 41.

42.     In its Complaint against Premier Design, Duke Realty alleges Count I for Breach of Contract for the alleged breach by Premier Design of the Contract, which includes the following alleged failures by Premier Design:

a.  Prepare sufficient plans and specifications for the design, engineering, stabilization, and construction of the Access Bridges and the 980 High Street Building;

b.  Provide materials sufficient for the proper construction of the Access Bridges and the 980 High Street Building;

c.  Properly test the soil at the locations selected for the construction of the Access Bridges and the 980 High Street Building to ensure that the soil conditions were properly taken into account in designing the foundational support for the Access Bridges and the 980 High Street Building;

d.  Properly design the foundational support for the Access Bridges and the 980 High Street Building; and

e.  Properly supervise the construction of the Access Bridges and the 980 High Street Building to ensure compliance with plans, specifications, and all applicable codes, laws, regulations, and industry standards.

*See* Group Exhibit "C" at p. 10, ¶ 53.

43.     As a result of Premier Design's alleged breach of contract, Duke Realty alleges that the 980 High Street Building and the Access Bridges are defective. *See* Group Exhibit "C" at p. 10, ¶ 55.

44.     Duke Realty alleges that "[t]o make the 980 High Street Building fit for its intended use, Duke retained additional experts and contractors to analyze, design, and ultimately repair the 980 High Street Building at a total cost to be determined at trial." and "[t]o make the Access Bridges fit for their intended use, Duke retained additional experts and contractors to analyze, design, and ultimately repair the Access Bridges at a total cost to be determined at trial." See Group Exhibit "C" at p. 11, ¶¶ 56; 57.

45.     For the alleged defective construction of the 980 High Street Building and Access

16

Bridges, Duke Realty seeks compensatory damages, consequential and incidental damages, interest, costs, fees, and reasonable attorneys' fees incurred.  *See* Group Exhibit "C" p. 11 at the Wherefore clause to Count I.

46.     Duke Realty also alleges Count II for Negligence, in the alternative, against Premier Design in Duke Realty's Complaint, alleging that Premier Design breached its duty to exercise reasonable care owed to Duke Realty in designing, engineering, constructing, and/or supervising the construction of the 980 High Street Building and the Access Bridges in accordance with all approved plans, applicable specifications, reasonable commercial standards in the industry for the construction of access bridges and warehouses, and all applicable state and local building codes, regulations, and ordinances.  *See* Group Exhibit "C" at p. 11, ¶¶ 60; 61.

47.     As a result of Premier Design's alleged breach of its duty to exercise reasonable care, Duke Realty alleges that it has been damaged.  *See* Group Exhibit "C" at p. 12, ¶ 62.

48.     Duke Realty also alleges Count III for Professional Negligence, in the alternative, against Premier Design in Duke Realty's Complaint, alleging that pursuant to the Contract, Premier Design agreed to provide design and engineering services to Duke Realty.  *See* Group Exhibit "C" at p. 12, ¶ 65.

49.     Duke Realty alleges that Premier Design breached its duty to exercise reasonable professional care owed to Duke Realty in designing, engineering, constructing, and/or supervising the construction of the 980 High Street Building and the Access Bridges in accordance with all approved plans, applicable specifications, reasonable commercial standards in Premier Design's respective professional industry for the construction of access bridges and warehouses, and all applicable state and local building codes, regulations, and ordinances.  *See* Group Exhibit "C" at p. 12, ¶ 66.

50.     Duke Realty also alleges that Premier Design owed a duty to exercise reasonable professional care in hiring and supervising the contractors and subcontractors working on the design, engineering, and construction of the 980 High Street Building and Access Bridges to ensure that all work was done in accordance with approved plans, applicable specifications, reasonable  commercial standards in Premier Design's respective professional industry for the construction of access bridges and warehouses, and all applicable state and local building codes, regulations, and ordinances.  *See* Group Exhibit "C" at pp. 12-13, ¶ 67.

51.     Duke Realty alleges that Premier Design breached its duty of reasonable professional care which damaged Duke Realty.  *See* Group Exhibit "C" at p. 13, ¶¶ 68; 69.

### 2.     The Underlying New Jersey Action

52.     On March 28, 2023, Duke Realty filed an action in New Jersey titled *Duke Realty ePort Urban Renewal LLC v. Viridian Partners, LLC, et al.*, Case No. MID-L-001767- 23, pending in the Superior Court of New Jersey Law Division, Middlesex County ("Underlying New Jersey Action"). *See* Amended Complaint at Group Exhibit "C", p. 16.  In the Amended Complaint, Duke Realty seeks damages against the underlying defendants Viridian Partners, LLC, NASDI LLC, Moretrench American Corporation, Shippee Engineering, Inc., Think Pavers, Menlo Engineering Associates, Inc., SESI Consulting Engineers, Terra Contracting Services, LLC, FRM Construction Services, Jersey Essay Labs and various unknown architects, professional corporations and contractors arising out of the their alleged failure to properly design, engineer, and construct a series of Access Bridges that included concrete forms, foundational supports, retaining walls and roadway approaches at the Project.  *See* Group Exhibit "C" at pp. 16-17, ¶ 1.

53.     Duke Realty alleges that SESI is an engineering firm that provided engineering design services, contracting services, planning services, supervisory and oversight services, and

18

other services with regard to the development, design, and construction of the Access Bridges. *See* Group Exhibit "C" at pp. 18-19, ¶ 11.

54.     Duke Realty alleges that it is the current owner of certain parcels constituting approximately 103 acres of real property located on the Property.  *See* Group Exhibit "C" at p. 20, ¶ 19.  Duke Realty alleges that, due to the underlying defendants' failures, the Access Bridges are settling, cracking, and in various states of disrepair and diminished integrity, which impacts Duke Realty's use of the Property.  *See* Group Exhibit "C" at p. 17, ¶ 2. Duke Realty seeks damages for the costs associated with mitigating and repairing the damage allegedly caused by the underlying defendants' actions. *See* Group Exhibit "C" at p. 17, ¶ 3.

55.     In the Amended Complaint, Duke Realty alleges the Property was owned by Viridian, which undertook extensive remediation to initiate redevelopment efforts at the site culminating with a plan for the construction of a warehouse campus at the Property.  *See* Group Exhibit "C" at p. 20, ¶ 21.

56.     Viridian allegedly planned the construction of three Access Bridges to enable access to and from areas on the Project. The Access Bridges included: (i) the Northern access bridge leading to 980 High Street, Perth Amboy, New Jersey; (ii) the Eastern access bridge leading to 1000 High Street, Perth Amboy, New Jersey; and (iii) the Western access bridge leading to 1000 High Street, Perth Amboy, New Jersey.  *See* Group Exhibit "C" at pp. 20-21, ¶ 23.

57.     The Access Bridges allegedly were built prior to the construction of the warehouses on the Project.  Bridge Perth allegedly purchased the Property from Viridian in or about 2015, and Duke Realty purchased the Property from Bridge Perth in or about November 2017.  *See* Group Exhibit "C" at p. 21, ¶¶ 25, 26.

19

58. Duke Realty alleges Viridian and/or Bridge entered into contracts with NASDI, Moretrench, Shippee, Think Pavers, Menlo, SESI, Terra, FRM Construction Services, and Jersey Essay Labs for the design and construction of the Access Bridges and all foundational support. *See* Group Exhibit "C" at p. 21, ¶ 28. Duke Realty alleges SESI acted as a geotechnical engineer and participated in the design of the Access Bridges, including soils and support of the Access Bridges. *See* Group Exhibit "C" at p. 21, ¶ 32.

59. Duke Realty alleges that the underlying defendants purported to review the design plans for the Access Bridges as well as oversee the construction of the Access Bridges to ensure they would perform as intended and to ensure they were built in accordance with the plans and specifications. *See* Group Exhibit "C" at p. 22, ¶ 38. The Northern Access Bridge is allegedly a concrete arch structure with asphalt roadway above. *See* Group Exhibit "C" at p. 22, ¶ 39. The Northern Access Bridge allegedly spans utility pipelines running beneath it and provides vehicle access to the warehouse located at 980 High Street, which is currently occupied by Target and used as a Distribution Center. *See* Group Exhibit "C" at p. 22, ¶ 39. The Eastern Access Bridge and the Western Access Bridge are allegedly concrete arch structures with asphalt roadway above. *See* Group Exhibit "C" at p. 23, ¶ 40. The Eastern Access Bridge and the Western Access Bridge allegedly span a drainage creek and provided vehicle access to the warehouse located at 1000 High Street. *Id.* Duke Realty alleges the Viridian and/or Bridge entered into contracts with certain unknown design and construction contractors to work on the Access Bridges. *See* Group Exhibit "C" at p. 23, ¶ 41.

60. Duke Realty alleges that the property and the soil beneath it are comprised of numerous layers of different types of materials, including a layer of artificial fill (gravel, rock, and man- made materials) and, below that, soft, organic, silty clay. *See* Group Exhibit "C" at p. 23, ¶

20

42. Duke Realty further alleges that heavy truck and tractor-trailer traffic over the Access Bridges at the Project was anticipated upon completion and occupancy of the warehouses, and that the Access Bridges and their foundational elements were poorly planned, poorly designed, poorly constructed, and thus not sound or fit for their purposes. *See* Group Exhibit "C" at p. 23, ¶¶ 43-44.

61. These defects allegedly have led the Northern Access Bridge to suffer significant damage, including but not limited to: (i) settlement of the bridge; (ii) fractures and depressions in the asphalt roadway; (iii) cracks in the frame of the bridge; and (iv) gaps, settlement, and separation in the concrete masonry unit blocks making up the retaining walls, and therefore, the Northern Access Bridge allegedly remains partially closed. *See* Group Exhibit "C" at p. 23, ¶¶ 45-46. The Amended Complaint alleges that the Eastern Access Bridge and the Western Access Bridge have also suffered damage, including but not limited to: (i) settlement of both bridges; (ii) cracks in the frame of both of the bridges; and (iii) gaps, settlement, and separation in the concrete masonry unit blocks making up the retaining walls. *See* Group Exhibit "C" at p. 24, ¶ 47.

62. Count I of the Amended Complaint alleges a claim for Breach of Contract due to the insufficient design and construction of the Access Bridges. *See* Group Exhibit "C" at p. 24, ¶ 51. Specifically, Duke Realty alleges that the underlying defendants failed to: (a) Prepare sufficient plans and specifications for the design, engineering, stabilization, and construction of the Access Bridges; (b) Provide materials sufficient for the proper construction of the Access Bridges; (c) Properly test the soil at the locations selected for construction of the Access Bridges to ensure that the soil conditions were properly taken into account in designing the foundational support for the Access Bridges; (d) Properly design the foundational support for the Access Bridges; and (e) Properly supervise the construction of the Access Bridges to ensure compliance with plans,

specifications, and all applicable codes, laws, regulations, and industry standards. *See* Group Exhibit "C" at p. 24, ¶ 51.

63.     In Count II of the Amended Complaint Duke Realty alleges a claim for negligence against underlying defendants Viridian, NASDI, Moretrench, Shippee, Think Pavers, Menlo, SESI, Terra, FRM Construction Services, and Jersey Essay Labs and various unknown architects, engineers, professional corporations, contractors, and contractor corporations, claiming that these defendants breached their duty to exercise reasonable care in designing, engineering, constructing, and/or supervising the construction of the Access Bridges in accordance with all approved plans, applicable specifications, reasonable commercial standards in the industry for the construction of access bridges, and all applicable state and local building codes, regulations, and ordinances. *See* Group Exhibit "C" at pp. 25-26, ¶¶ 57-59.

64.     In Count III of the Amended Complaint, Duke Realty alleges a claim for professional negligence against underlying defendants Moretrench, Shippee, Menlo, and SESI and various unknown architects, engineers, and professional corporations asserting that these defendants breached their professional duties. *See* Group Exhibit "C" at pp. 27-28, ¶¶ 64-70. Specific to SESI, Count III alleges that SESI owed a professional duty to exercise reasonable care in designing, constructing, and/or supervising the construction of the Access Bridges in accordance with all approved plans, applicable installation specifications, reasonable commercial standards in the industry for bridge design and construction, and all applicable state and local construction codes, regulations, and ordinances. *See* Group Exhibit "C" at p. 28, ¶ 67.

65.     In SESI's Answer to Duke Realty's Amended Complaint, SESI states it was retained by Viridian/VPGS LLC and then by Bridge Perth Amboy, LLC to perform specified engineering services. *See* Group Exhibit "C" at p. 36, ¶ 28.  SESI states it provided geo-technical

22

engineering services as set forth in its contracts. *See* Group Exhibit "C" at page 36, ¶ 32. SESI denied that it entered into contracts with Duke Realty as to the access roads. *See* Group Exhibit "C" at p. 38, ¶ 50.

### 3. SESI's Third-Party Complaint in Underlying New Jersey Lawsuit

66. On October 30, 2023, SESI filed a Third-Party Complaint against Bridge and Premier Group in the New Jersey Action. *See* Group Exhibit "C" at p. 32. SESI's Third-Party Complaint alleges that Duke Realty filed the Amended Complaint against various entities, including SESI, alleging defects in the three Access Bridges located at the Project. *See* Group Exhibit "C" at p. 45, ¶ 1.

67. In its Third-Party Complaint SESI alleges that, on or about October 5, 2015, Bridge retained SESI to provide specified geotechnical engineering services at the Property. *See* Group Exhibit "C" at p. 45, ¶ 4. SESI alleges that Premier Group was the contractor with respect to some or all of the Access Bridges at the Project which are alleged to be experiencing construction defects. *See* Group Exhibit "C" at p. 46, ¶ 6.

68. Count I of SESI's Third-Party Complaint seeks contribution from Bridge and Premier Group. *See* Group Exhibit "C" at p. 46, ¶ 8. Count II seeks indemnification from Premier Group and the other Third-Party Defendants. *See* Group Exhibit "C" at p. 47, ¶ 11.

### I. CNA's Policies

69. Continental issued one CGL policy to SESI as the named insured, bearing policy number 6056872807, and insuring the period December 23, 2017 to December 23, 2018, with limits of $1 Million per occurrence, a general aggregate limit of $2 Million, and a Products-Completed Operations aggregate limit of $2 Million. A true and correct copy of the Continental policy is located at **Exhibit "J"**.

23

70.     Continental Casualty issued five CGL policies to SESI bearing policy number 6056872807.  These policies insured the periods of December 23, 2018 to December 23, 2019; December 23, 2019 to December 23, 2020; December 23, 2020 to December 23, 2021; December 23, 2021 to December 23, 2022; and December 23, 2022 to December 23, 2023.  These policies further provide limits of liability of $1 Million per occurrence, a general aggregate limit of $2 Million, and a Products-Completed Operations aggregate limit of $2 Million.  True and correct copies of the Continental Casualty policies are located at **Group Exhibit "K"**.

71.     American Casualty issued one CGL policy to SESI with policy number 6056872807, a policy period of December 23, 2023 to December 23, 2024, and limits of $1 Million per occurrence, a general aggregate limit of $2 Million, and a Products-Completed Operations aggregate limit of $2 Million.  A true and correct copy of the American Casualty policy is located at **Exhibit "L"**.

72.     The CNA CGL policies include in the Commercial General Liability Coverage Part the following, in relevant part:

**SECTION I - COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.      Insuring Agreement**

> **a**. We will pay those sums that the **insured** becomes legally obligated to pay as **damages** because of **bodily injury** or **property damage** to which this insurance applies. We will have the right and duty to defend the **insured** against any **suit** seeking those **damages.**  However, we will have no duty to defend the **insured** against any **suit** seeking **damages** for **bodily injury** or **property damage** to which this insurance does not apply. We may, at our discretion, investigate any **occurrence** and settle any claim or **suit** that may result.  But:

*     *     *

24

*See* Group Exhibit "J", p. 129; Group Exhibit "K", pp. 131; 328; 579; 904; 1237; and Exhibit "L", p. 120.

73. The Continental CGL policy and Continental Casualty 2018-2019 CGL policy include a Blanket Additional Insureds endorsement, which states:

I. The **WHO IS AN INSURED** section is amended to add as an **Insured** any person or organization whom the Named Insured is required by **written contract** to add as an additional insured on this **Coverage Part**; including any such person or organization, if any, specifically set forth on the Schedule attachment to this endorsement. However, such person or organization is an **Insured** only with respect to such person or organization's liability for:

    A. **bodily injury**, **property damage**, or **personal and advertising injury** to the extent caused by:

        1. The **Named Insured's** acts or omissions; or

        2. the acts or omissions of those acting on the **Named Insured's** behalf,

in the performance of the **Named Insured's** ongoing operations specified in the **written contract**; or

    B. bodily injury or property damage to the extent caused by **your work** specified in the **written contract** and included in the **products-completed operations hazard**, and only if

        1. the **written contract** requires the **Named Insured** to provide the additional insured such coverage; and

        2. this coverage **part** provides such coverage.

*     *     *

III. The insurance granted by this endorsement to the additional insured does not apply to **bodily injury**, **property damage**, or **personal and advertising injury** arising out of:

    A. acts or omissions of the additional insured, or of anyone acting on the additional insured's behalf; or

    B. the rendering of, or the failure to render, any professional architectural, engineering, or surveying services, including:

25

> **1.** the preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
>
> **2.** supervisory, inspection, architectural or engineering activities; or
>
> **C.** any premises or work for which the additional insured is specifically listed as an additional insured on another endorsement attached to this **coverage part**.
>
> **IV.** Notwithstanding anything to the contrary in the section entitled **COMMERCIAL GENERAL LIABILITY CONDITIONS**, the Condition entitled **Other Insurance**, this insurance is excess of all other insurance available to the additional insured whether on a primary, excess, contingent or any other basis. However, if this insurance is required by **written contract** to be primary and non-contributory, this insurance will be primary and non-contributory relative solely to insurance on which the additional insured is a named insured.

*See* Exhibit "J", p. 163; and Group Exhibit "K", p. 165.

74.     The Continental Casualty 2019-2023 CGL policies and American Casualty CGL policy include a Blanket Additional Insured Endorsement, which states:

> **I.     WHO IS AN INSURED** is amended to include as an **Insured** any person or organization whom you are required by **written contract** to add as an additional insured on this **coverage part**, but only with respect to liability for **bodily injury**, **property damage** or **personal and advertising injury** caused in whole or in part by your acts or omissions, or the acts or omissions of those acting on your behalf:
>
> **A.** in the performance of your ongoing operations subject to such **written contract**; or
>
> **B.** in the performance of **your work** subject to such **written contract**, but only with respect to **bodily injury** or **property damage** included in the **products-completed operations hazard**, and only if:
>
> **1.** the **written contract** requires you to provide the additional insured such coverage; and
>
> **2.** this **coverage part** provides such coverage.
>
> **II.** But if the **written contract** requires:
>
> **A.** additional insured coverage under the 11-85 edition, 10-93 edition, or 10-01 edition of CG2010, or under the 10-01 edition of CG2037; or

26

**B.** additional insured coverage with "arising out of" language; or

**C.** additional insured coverage to the greatest extent permissible by law;

then paragraph **I.** above is deleted in its entirety and replaced by the following:

**WHO IS AN INSURED** is amended to include as an **Insured** any person or organization whom you are required by **written contract** to add as an additional insured on this **coverage part**, but only with respect to liability for **bodily injury**, **property damage** or **personal and advertising injury** arising out of **your work** that is subject to such **written contract**.

\* \* \*

**IV.** The insurance granted by this endorsement to the additional insured does not apply to **bodily Injury**, **property damage**, or **personal and advertising Injury** arising out of:

**A.** The rendering of, or the failure to render, any professional architectural, engineering, or surveying services, including:

**1.** the preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

**2.** supervisory, inspection, architectural or engineering activities; or

**B.** any premises or work for which the additional insured is specifically listed as an additional insured on another endorsement attached to this **coverage part.**

*See* Group Exhibit "K", pp. 393; 703; 1028; 1408; and Exhibit "L", pp. 314-15.

75. These policies contain an Engineers, Architects or Surveyors Professional Liability Exclusion Endorsement, which states in part:

This insurance does not apply to **bodily injury**, **property damage** or **personal and advertising injury** arising out of the rendering of or failure to render any professional services by the **Named Insured** or any engineer, architect or surveyor who is either employed by the **Named Insured** or performing work on the **Named Insured's** behalf in such capacity.

Professional services include:

27

A.    the preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

B.    supervisory, inspection, architectural or engineering activities.

*See* Group Exhibit "K", pp. 178; 408; 720; 1045; 1426; and Exhibit "L", p. 346.

76.    The CNA CGL policies include a Primary and Noncontributory – Other Insurance Endorsement which states in relevant part as follows:

It is understood and agreed that the condition entitled **Other Insurance** is amended to add the following:

**Primary And Noncontributory Insurance**

Notwithstanding anything to the contrary, this insurance is primary to and will not seek contribution from any other insurance available to an additional insured under this policy provided that:

**a.**    the additional insured is a named insured under such other insurance; and

**b.**    the **Named Insured** has agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

*See* Group Exhibits "K", pp. 168; 396; 706; 1031; 1411; and "L", p. 320.

### J.    The Amerisure Policies

77.    Amerisure issued commercial general liability ("CGL") policies to each Premier Design entity, with annual policy periods running from July 1, 2015 to July 1, 2023 (collectively "the Amerisure CGL Policies").

78.    The Amerisure CGL Policies have a $1 Million Each Occurrence Policy Limit, a $2 Million General Aggregate Policy Limit, and a $2 Million Products-Completed Operations Aggregate Policy Limit.

#### 1.    Amerisure Mutual Insurance Company CGL Policies Issued to Premier Group

28

79. Amerisure Mutual Insurance Company issued the following CGL Policies to Premier Group:

- Policy No. CPP 20926450102, in effect from July 1, 2015 to July 1, 2016;

- Policy No. CPP 20926450202, in effect from July 1, 2016 to July 1, 2017;

- Policy No. CPP 20926450302, in effect from July 1, 2017 to July 1, 2018;

- Policy No. CPP 20926450402, in effect from July 1, 2018 to July 1, 2019;

- Policy No. CPP 20926450502, in effect from July 1, 2019 to July 1, 2020;

- Policy No. CPP 20926450602, in effect from July 1, 2020 to July 1, 2021;

- Policy No. CPP 20926450702, in effect from July 1, 2021 to July 1, 2022; and

- Policy No. CPP 20926450802, in effect from July 1, 2022 to July 1, 2023.

Copies of these policies are attached hereto as **Exhibits "M-1"** through **"M-8"**.

### 2. Amerisure Mutual Insurance Company CGL Policies Issued to Premier National

80. Amerisure Mutual Insurance Company issued the following CGL Policies to Premier National:

- Policy No. CPP 20978480002, in effect from July 1, 2015 to July 1, 2016;

- Policy No. CPP 20978480102, in effect from July 1, 2016 to July 1, 2017;

- Policy No. CPP 20978480302, in effect from July 1, 2017 to July 1, 2018;

- Policy No. CPP 20978480402, in effect from July 1, 2018 to July 1, 2019;

- Policy No. CPP 20978480502, in effect from July 1, 2019 to July 1, 2020;

- Policy No. CPP 20978480602, in effect from July 1, 2020 to July 1, 2021; and

- Policy No. CPP 20978480802, in effect from July 1, 2022 to July 1, 2023.

Copies of these policies are attached hereto as **Group Exhibit "N"**.

81. The CGL Coverage Part of the CGL Policies states in relevant part:

**SECTION I - COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

> **a**. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:
>
> \* \* \*
>
> **b**. This insurance applies to "bodily injury" and "property damage" only if:
>
> \* \* \*
>
> **(2)** The "bodily injury" or "property damage" occurs during the policy period; . . .
>
> \* \* \*

*See* Exhibits "M-1", p. 154; "M-2", p. 167; "M-3", p. 171; "M-4", p. 171; "M-5", p. 182; "M-6", p. 176; "M-7", p. 187; "M-8", p. 187; Group Exhibit "N", pp. 79; 219; 366; 526; 670; 820; 969.

82. The CGL portion of the Amerisure CGL Policies include a Definitions section, which in part includes the following definitions:

> **8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
>
> a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

* * *

See Exhibits "M-1", p. 166; "M-2", p. <u>179</u>; "M-3", p. 183; "M-4", p. 183; "M-5", p. 194; "M-6",

p. 188; "M-7", p. 199; "M-8", p. 199; Group Exhibit "N", pp. 91; 231; 378; 538; 682; 832; 981.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

* * *

See Exhibits "M-1", p. 168; "M-2", p. 181; "M-3", p. 184; "M-4", p. 185; "M-5", p. 196; "M-6",

p. 190; "M-7", p. 201; "M-8", p. 201; Group Exhibit "N", pp. 92; 233; 379; 540; 684; 834; 983.

17. "Property damage" means:

 **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

 **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

See Exhibits "M-1", p. 168; "M-2", p. 181; "M-3", p. 185; "M-4", p. 185; "M-5", p. 196; "M-6",

p. 190; "M-7", p. 201; "M-8", p. 201; Group Exhibit "N", pp. 93; 233; 380; 540; 684; 834; 983.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

31

    **a.**    An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    **b.**    Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

*    *    *

**21.**    "Your product"

    **a.**    Means:

        **(1)**    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            **(a)**    You;

            **(b)**    Others trading under your name; or

            **(c)**    A person or organization whose business or assets you have acquired; or

        **(2)**    Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    **b.**    Includes:

        **(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

        **(2)**    The providing of or failure to provide warnings or instructions.

    **c.**    Does not include vending machines or other property rented to or located for the use of others but not sold.

*See* Exhibits "M-1", p. 169; "M-2", p. 182; "M-3", pp. 185-186; "M-4", p. 186; "M-5", p. 197; "M-6", p. 191; "M-7", p. 202; "M-8", p. 202; Group Exhibit "N", pp. 93; 234; 380; 541; 685; 835; 984.

**22.** "Your work":

    **a.** Means:

        **(1)** Work or operations performed by you or on your behalf; and

        **(2)** Materials, parts or equipment furnished in connection with such work or operations.

    **b.** Includes:

        **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

        **(2)** The providing of or failure to provide warnings or instructions.

*See* Exhibits "M-1", p. 169; "M-2", p. 182; "M-3", p. 186; "M-4", p. 186; "M-5", p. 197; "M-6", p. 191; "M-7", p. 202; "M-8", p. 202; Group Exhibit "N", pp. 94; 234; 381; 541; 685; 835; 984.

83. The Amerisure CGL Policies include the Other Insurance Condition which states in part:

    **(1)** This insurance is excess over:

*    *    *

    **(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

*See* Exhibits "M-1", p. 165; "M-2", p. 178; "M-3", p. 181; "M-4", p. 182; "M-5", p. 193; "M-6", p. 187; "M-7", p. 198; "M-8", p. 198; Group Exhibit "N", pp. 89; 230; 376 ; 537; 681; 831; 980.

84. The Amerisure CGL Policies also include the Transfer Of Rights Of Recovery Against Others To Us Condition, which states in pertinent part:

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing

after loss to impair them. At our request, the insured will bring 'suit' or transfer those rights to us and help us enforce them.

*See* Exhibits "M-1", p. 166; "M-2", p. 179; "M-3", p. 182; "M-4", p. 183; "M-5", p. 194; "M-6", p. 188; "M-7", p. 199; "M-8", p. 199; Group Exhibit "N", pp. 90; 231; 377; 538; 682; 832; 981.

85. The Amerisure CGL Policies contain an endorsement entitled Illinois Changes – Defense Costs, which sets forth as follows:

**A.** The provisions of Paragraph B. are added to all Insuring Agreements that set forth a duty to defend under:

**1.** Section I of the Commercial General Liability, Commercial Liability Umbrella….Coverage Parts . . . .

\*　　　\*　　　\*

**B.** If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred. ]

The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs.

*See* Exhibits "M-1", p. 27; "M-2", p. 32; "M-3", p. 31; "M-4", p. 31; "M-5", p. 32; "M-6", p. 29; "M-7", p. 32; "M-8", p. 32; Group Exhibit "N", pp. 19; 155; 302; 460; 603; 752; 901.

**K.** **The Declaratory Judgment Action and Description of the Parties**

86. Amerisure, as insurer which issued policies to Premier Design, filed this action on June 26, 2023, seeking declaratory and other relief that no duty to defend or indemnify Premier Design is owed in regard to the Underlying Action. [D.E. (Docket Entry) 1].

34

87. In response, Premier Design filed an Answer and Counterclaim against Amerisure on October 3, 2023, alleging that Amerisure owes Premier Design a duty to defend and indemnify in regard to the Underlying Action under the Amerisure policies. [D.E. 16].

88. Amerisure filed its Answer and Affirmative Defenses to the Counterclaim on October 24, 2023, denying the allegations in the Counterclaim, and maintaining that the claims alleged in the Underlying Action are not covered under the Amerisure policies. [D.E. 24].

89. Amerisure subsequently undertook the defense of Premier Design in the Underlying Action and filed an Amended Complaint, seeking declaratory and other relief that insurers of several of Premier Design's subcontractors owe Premier Design a primary and noncontributory defense in the Underlying Action, a duty to indemnify Premier Design in the Underlying Action if and when a judgment is entered against, or settlement reached with, Premier Design, and reimbursement of Amerisure for the amounts it has incurred in the defense of Premier Design in the Underlying Action, which added, amongst other parties, the CNA Defendants. [D.E. 32].

90. Amerisure subsequently filed a Second Amended Complaint that added several additional Defendants to this action as well as allegations regarding the underlying New Jersey action [D.E. 142].

91. Amerisure also filed a Third Amended Complaint that added an additional Defendant [D.E. 181].

**L. Facts Supporting Venue and Jurisdiction in this Court**

92. This Action was originally filed with this Court pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

93.     Venue is premised upon 28 U.S.C. § 1391(b)(1), (c)(2) and (d) because Amerisure and CNA are subject to personal jurisdiction in this district proper.

**M.     Amounts Amerisure Allege They Incurred in the Defense of Premier Design in the Underlying Actions**

94.     Amerisure contend that they have at least $156,127.04 in unreimbursed defense expenses after credit for amounts received in a settlement and to be received in settlements in principle with other Defendants in this case, as set forth in the affidavit of Jared Pratt, Amerisure's representative in this action, a true and correct copy of which is attached at Exhibit "O".  The parties agree that Amerisure has provided most but not all of the invoices for the defense expenses to CNA attached to email correspondences dated January 3, 2025, May 6, 2025, and April 15, 2026.  CNA disputes the total amount claimed by Amerisure to be unreimbursed defense costs and are not in a position to agree to the amount sought by Amerisure until they receive – and Amerisure produce – proof of all alleged payments and recoupment of any such payments from other sources.

Dated: July 10, 2026

Respectfully submitted,

| By: /s/ *Donald E. Elder* | /s/ *Douglas M. DeWitt* |
|---|---|
| Emerson & Elder, P.C. | Douglas M. DeWitt (# 6274805) |
| | **Hinkhouse Williams Walsh LLP** |
| Donald E. Elder (IL ARDC #6255889) | 180 North Stetson, Suite 3400 |
| Brett L. Warning (IL ARDC #6199057) | Chicago, IL 60601 |
| Emerson & Elder, P.C. | ddewitt@hww-law.com |
| 53 West Jackson Blvd., Suite 526 | Telephone: 312-784-5400 |
| Chicago, IL 60604 | |
| Tel: (773) 456-4538 | *Attorney for The Continental Insurance* |
| Email: dee@emersonelder.com | *Company, Continental Casualty Company, and* |
| Email: brett@emersonelder.com | *American Casualty Co. of Reading, PA* |

| *Attorney for Plaintiffs and Counter-Defendants, Amerisure Insurance Company and Amerisure Mutual Insurance Company* | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 10, 2026, a true and correct copy of the foregoing document has been furnished electronically to all counsel of record via the Court's CM/ECF system.

/s/ *Brett L. Warning*
Brett L. Warning (IL ARDC #6199057)
Emerson & Elder, P.C.
53 West Jackson Boulevard, Suite 526
Chicago, Illinois 60604
Telephone: (773) 456-4538
Facsimile: (312) 265-1603
E-mail: brett@emersonelder.com

*Attorneys for Plaintiffs and Counter-Defendants, Amerisure Insurance Company and Amerisure Mutual Insurance Company*